# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| AARNO OLAVI LIUKSILA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-00229 (APM) |
| | ) | |
| ROBERT F. TURNER,[1] | ) | |
| | ) | |
| Respondent. | ) | |

_____ )

## MEMORANDUM OPINION

## I.    INTRODUCTION

Petitioner Aarno Liuksila is wanted for prosecution in Finland for making false statements during an official government proceeding.  He petitions this court for a writ of habeas corpus, arguing that Finland's extradition request does not satisfy two conditions under the Extradition Treaty between the United States and Finland.  First, he asserts that the principle of dual criminality is not satisfied, because the crime with which he is charged in Finland is not a crime under any federal or state law in the United States.  Second, he maintains that the five-year statute of limitations to prosecute him for a comparable offense in the United States has run, and so too has the Finnish ten-year limitations period.  A magistrate judge of this District Court found neither of these arguments compelling and ordered Petitioner's extradition.  Petitioner now turns to this court for habeas relief.

---

[1] The court has substituted Robert F. Turner, the Acting United States Marshal for the District of Columbia, as the defendant.  Under the federal habeas statute, the proper respondent is the "person who has custody over [the petitioner.]"  28 U.S.C. §§ 2242, 2243.  In this instance, the United States Marshal for the District of Columbia has constructive custody over Petitioner.

For the reasons discussed below, the court denies the writ. Petitioner has failed to establish that the conduct at issue in Finland would not be unlawful if comparable conduct occurred in the United States. Likewise, he has not carried his burden to show that the statute of limitations has expired either in the United States or in Finland. Petitioner therefore cannot avoid extradition—at least before this court.

The court's conclusion comes with a major asterisk, however. When deciding whether the five-year limitations period under U.S. law has expired, the court cannot simply add five years from the date of the alleged offense and compare it against the date on which Finland initiated charges. Rather, it must apply U.S. federal law as written and as judicially interpreted, including for purposes of tolling. The U.S. Code provides that "[n]o statute of limitations shall extend to any person fleeing from justice." 18 U.S.C. § 3290. A nearly 80-year old case from the D.C. Circuit, *McGowen v. United States*, interprets section 3290's text to mean that the limitations period tolls upon a person's physical departure from the prosecuting jurisdiction, regardless of whether the person intends to evade justice. *See* 105 F.2d 791, 792 (D.C. Cir. 1939). Under this reading, known as the "mere absence" rule, if a person leaves the prosecuting jurisdiction, even when no prosecution is pending or the person has no reason to believe one is imminent, the limitations period automatically stops running. All that matters is the person departed; the reason why is immaterial.

The unfairness *McGowen* creates in this case is apparent. Petitioner left Finland within five years of the offense conduct, at a time when there was no prosecution pending nor was one imminent. But no matter. The moment Petitioner left Finland for the United States the *United States* limitations period for extradition purposes tolled and never restarted because Petitioner never went back to Finland. So, the fact that Finnish authorities waited more than five years to

initiate a prosecution provides no protection to Petitioner. His prosecution under U.S. law is timely simply because he left Finland before the five-year period expired, even though it would appear he had no intent to abscond from or evade Finnish prosecution.

The court respectfully submits that the D.C. Circuit should revisit *McGowen* and the mere absence rule. The decision is problematic for a host of reasons.

First, the mere absence rule conflicts with the plain meaning of 18 U.S.C. § 3290. By using the phrase "fleeing from justice" in the statute ("No statute of limitations shall extend to any person fleeing from justice"), Congress surely meant that a person had to be actively evading prosecution for the limitations period to toll; physical absence for reasons other than evasion cannot be enough.

Second, the Circuit's reading conflicts with Supreme Court precedent. In *Streep v. United States*, decided in 1895, the Supreme Court interpreted a predecessor of section 3290, which also used the words "fleeing from justice," as requiring flight with the intention of avoiding prosecution. 160 U.S. 128, 133 (1895). *McGowen*'s mere absence rule arises from a misreading of *Streep*.

Third, *McGowen* represents the minority view among the federal appeals courts. Since *McGowen*, the circuit courts almost uniformly have rejected the mere absence rule and, instead, have held that the limitations period is tolled under section 3290 only if the person absents himself from the jurisdiction in order to avoid prosecution.

Finally, the D.C. Circuit's minority view affects a particularly harsh result in this case. Had Petitioner lived a few miles away in Virginia or Maryland, he would not be subject to extradition, as the Fourth Circuit requires evidence of an intent to evade justice for section 3290 tolling to go into effect. Such disparate application of federal law to an extradition treaty is simply

unjust. This court therefore respectfully urges the D.C. Circuit to reconsider and overturn *McGowen*.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    *Alleged Criminal Conduct in Finland*

In February 2010, Finland requested the extradition of Petitioner Aarno Liuksila, a Finnish national who lives in Washington, D.C. Finland made this request pursuant to the U.S.-Finland Extradition Treaty and its corresponding Protocol ("the U.S.-Finland Extradition Treaty"). *See* Joint Appx. of Parties, ECF No. 21, Decl. of Samuel W. McDonald, ECF No. 21-2, at 3.

The prosecution for which Petitioner is sought in Finland has no exactly perfect analog in the United States. Petitioner stands accused of making false statements in a "debt enforcement proceeding." Under Finnish law, a Finnish government official, known as a "bailiff," can convene a debt enforcement proceeding to aid in the enforcement of private debts, including by compelling the debtor to identify his assets. *See* Ltr. from Dr. Jussi Tapani, ECF No. 21-1, at 89.[2] It is in this proceeding that Petitioner is alleged to have lied.

Petitioner's prosecution has its roots in a real estate transaction. In 1999, Petitioner bought shares in a Finnish stock holding company that held residential real property. *See* Aff. from Ephraim Wernick, ECF No. 21-1, at 76. On January 1, 2000, Petitioner purportedly sold his shares in the company. *See* Formal Extradition Request, ECF No. 21-2 [hereinafter Formal Extradition Request], at 42. The Finnish authorities viewed the sale suspiciously based on a few peculiarities:

---

[2] At the time in question, a person could be compelled to answer questions in a debt enforcement proceeding, without any right to invoke silence to avoid self-incrimination. Following a ruling of the European Court of Human Rights in 2009, a person may now elect to remain silent in a debt enforcement proceeding. *See* Ltr. from Dr. Jussi Tapani, ECF No. 21-1, at 89.

no money exchanged hands, the trade register numbers and business codes of the buyer were not assigned at the time of sale, and Petitioner continued to collect rent on the property well after the sale. *See In re Liuksila*, 74 F. Supp. 3d 4, 6 (D.D.C. 2014). Based on this evidence, Finnish authorities concluded that the sale was a sham transaction, by which Petitioner simply transferred the real property from one company he controlled to another. Formal Extradition Request at 42 (calling the sale "fictitious").

Why go to the trouble of hiding assets? To put them beyond the reach of his child's mother, say Finnish authorities. Since at least 1999, Petitioner had failed to make ordered child support payments. *See* Pet.'s Memo. in Support of Petition [hereinafter Pet.'s Mem.], ECF No. 7, at 33 n.13. On February 12, 2001, the Finnish government issued a distraint on Petitioner's shares in the stock holding company to satisfy the child support debt. *See* Formal Extradition Request at 42. It notified Petitioner of the distraint on May 8, 2001. *See id*. at 42, 51.

The following year, on January 24, 2002, Petitioner appeared at a debt enforcement proceeding. *See id*. at 42. During the proceeding, Finnish prosecutors allege, Petitioner misrepresented that he had made a bona fide sale of the stock holding company's shares prior to the distraint, when in truth he had transferred the shares to another company that he controlled. *See id*.[3]

Over four years after he testified in the debt enforcement proceeding, in April 2006, Petitioner returned to his home in Washington, D.C., on a permanent basis. *See* Pet.'s Supplemental App'x, ECF No. 24, Decl. of Liidia Liuksila, ECF No. 24-5, ¶ 9. At the time of his

---

[3] In its Extradition Request, the Finnish government alleged that Petitioner made two misrepresentations in the inquiry. Formal Extradition Request at 51. He falsely stated that he had sold the shares prior to distraint, and he falsely said the bank had made the transaction on its own initiative. *Id*. The court views these two statements as part of the same misrepresentation.

departure from Finland, no criminal charges were pending against Petitioner. And Finnish authorities have not furnished any evidence showing that, when he left Finland, Petitioner had any reason to suspect that any criminal charges were forthcoming.

While in the United States, Petitioner's location was no mystery to U.S. or Finnish authorities. *Id.* ¶¶ 4, 11–12. He continuously resided with his family—his wife and two daughters—at a known address in Washington, D.C. *Id.* ¶¶ 4, 10. The Finnish Embassy mailed holiday greetings and invitations to that address, and Petitioner attended multiple events at the Embassy. *Id.* ¶¶ 4, 11. In 2006, Petitioner sat for an interview with the U.S. Attorney's Office in Washington, D.C., concerning the shares transaction. Interview Memo., ECF No. 21-1, at 144–152.

2. *Petitioner's Prosecution and the Request for Extradition*

On October 23, 2007, five years and nine months after the debt enforcement proceeding, a Finnish court issued a summons charging Petitioner with two offenses under Finnish law: "aggravated fraud by a debtor" and "dishonesty by a debtor." *See* Letter from Juhani Korhonen, Finland Ministry of Justice, ECF No. 21-1, at 82; Formal Extradition Request at 53–54. Under the Finnish criminal code, aggravated fraud by a debtor criminalizes the following conduct:

> A debtor who, in order to obtain unlawful financial benefit for himself or herself or another in bankruptcy, enforcement, debt adjustment or restructuring proceedings 1) conceals his or her property, 2) reports a liability that is false in full or in part, or based on a sham transaction, 3) gives other false or misleading information on a circumstance that is significant from the point of the view of the creditors, or 4) fails to report a liability.

*See* Formal Extradition Request at 53. Dishonesty by a debtor, under Finnish law, criminalizes the following conduct:

> A debtor who, knowing that due to his/her already existing or expected financial difficulties his/her act may harm the financial

> interests of his/her creditors, 1) destroys his/her property, 2) gives away or otherwise surrenders his/her property without acceptable reason, 3) transfers his/her property abroad in order to place it beyond the reach of his/her creditors, or 4) increases his/her liabilities without basis.

*Id.* at 54. Both charges carry penalties up to at least one year of imprisonment. *See id.* at 36.

Before seeking extradition, Finland asked the United States to assist in serving Petitioner with the criminal summons to appear at a hearing in Finland before the Turku District Court, located in Turku, Finland. *See* Finnish Extradition Application, ECF No. 21-1, at 160. The United States completed service of the summons by certified mail on June 26, 2009, and thereafter notified the Finnish authorities. *See* Letter from Juhani Korhonen, Finland Ministry of Justice, ECF No. 21-1, at 82; *see also* Certified Mail Postal Receipt, ECF No. 21-2, at 86. Petitioner did not appear at the hearing in Finland. *See* Formal Extradition Request at 37.

After Petitioner's absence, the Finnish government requested extradition pursuant to the U.S.-Finland Extradition Treaty. *See* Formal Extradition Request at 35. In December 2013, the United States filed a complaint for arrest and extradition in this District Court, and a magistrate judge issued a warrant. *See In re Liuksila*, 74 F. Supp. 3d at 7. Soon thereafter, American authorities arrested Petitioner and brought him before this District Court. Resp. Opp. to Pet.'s Pet. for Habeas, ECF No. 9, at 2.

### 3. *Extradition Proceedings*

Petitioner first appeared before Magistrate Judge Deborah A. Robinson to contest extradition. There, Petitioner argued that his extradition would be unlawful under the U.S.-Finland Treaty because (1) the dual criminality requirement had not been met, *see In re Liuksila*, 74 F. Supp. 3d at 10, and (2) the statutes of limitations on the charged offenses had expired in both Finland and the United States, *see id.* at 12–15. Judge Robinson accepted evidence from the parties

and held five hearings from January 13, 2014, through April 28, 2014, on the extradition. *See id.* at 6. She ruled that (1) the dual criminality principle was satisfied because Petitioner's alleged conduct underlying the charge of aggravated fraud by a debtor was comparable to mail and wire fraud in the United States, *id.* at 9–12, and (2) the statutes of limitations in both countries had not expired, *id.* at 12–15. She also found, however, that the United States did not have an analogous criminal law prohibiting Petitioner's conduct comprising the alternative charge of dishonesty by a debtor. *Id.* at 12.

Judge Robinson certified Petitioner's extradition on November 7, 2014, and again after Petitioner moved for reconsideration, on January 5, 2016. *See generally id.*; *see also In re Liuksila*, 133 F. Supp. 3d 249 (D.D.C. 2016).

### B. Procedural Background

Not satisfied with the outcome of the extradition proceedings, on February 12, 2016, Petitioner moved under 28 U.S.C. § 2241 for a Writ of Habeas Corpus. *See* Pet. Writ of Habeas Corpus, ECF No. 1. Petitioner and the United States initially briefed the Petition as if it were a direct appeal from Judge Robinson's decision, with Petitioner arguing that she had erred and the United States contending the opposite. *See* Initial Briefing, ECF Nos. 7, 9, 10.

That approach, however, misconstrued the applicable burdens in a habeas proceeding. As the court explained in an Order issued on October 27, 2016, a petition for writ of habeas corpus is "not a neutral proceeding in which the petitioner and the State stand on an equal footing." *See* Order, ECF No. 15 (quoting *Skaftouros v. United States*, 667 F.3d 144, 158 (2d. Cir. 2011)). Instead, the magistrate judge's certification is "presumptively valid," thereby requiring *the petitioner* to "prove by a preponderance of the evidence that he is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Id.* (quoting *Skaftourous*, 667 F.3d at 158).

The court invited Petitioner to submit additional evidence and asked the parties to provide supplemental briefing with the properly allocated burdens in mind. *Id*. Thereafter, Petitioner provided supplemental evidence, *see* Supp. Appx., ECF No. 24, the parties submitted a joint appendix of evidence, *see* Joint Appx. of Parties, ECF No. 21, and the parties filed supplemental briefing on the writ, *see* Parties' Supp. Mems., ECF Nos. 23, 25, 26.

Following this second round of briefing, this matter remained effectively stayed for ten months. *See* Joint Status Reports, ECF Nos. 29, 37, 42. During that time, at the court's not-so-subtle prompting, both Petitioner and the United States attempted to amicably resolve the extradition request and the pending criminal charges, potentially by way of a financial resolution with Petitioner's creditors. Unfortunately, those efforts proved unsuccessful.

The court therefore must now resolve the merits of the Petition. Petitioner essentially reasserts the arguments he presented to Judge Robinson. He contends that his custodial status and pending extradition violates the U.S.-Finland Extradition Treaty for two reasons. First, the principle of dual criminality is not satisfied. *See* Pet.'s Supp. Mem., ECF No. 23 [hereinafter Pet.'s Supp. Mem.], at 10–15. And, second, the Finnish prosecution is untimely under both the law of Finland and the United States. *See id*. at 3–9, 15. The court now turns to address these issues.

## III. LEGAL STANDARD

On collateral review of an extradition certification, a district court's review is limited. The court can "[1] inquire whether the magistrate had jurisdiction, [2] whether the offense charged is within the treaty and, by a somewhat liberal extension, [3] whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925). Here, Petitioner does not raise the first and third grounds

for review, so the court does not address them. The central issue in this matter is whether the offense with which Petitioner is charged falls within the Treaty's strictures.

Judge Robinson held that Petitioner's extradition does not violate the Treaty. That decision is not, strictly speaking, under review here. *See id.* (stating that the district court's review "is not a means for rehearing what the magistrate already has decided"). During an extradition certification proceeding, a magistrate judge conducts a preliminary hearing to determine whether the government can justify detaining and extraditing the accused. *See Benson v. McMahon*, 127 U.S. 457, 463 (1888); *see also Ward v. Rutherford*, 921 F.2d 286, 287–89 (D.C. Cir. 1990). In those proceedings, the burden rests on the government to justify extradition. *See Benson*, 127 U.S. at 463 (explaining that an extradition proceeding exists to ensure the fugitive's detention is justified). On habeas review, however, the burden shifts to the petitioner, who must prove by a preponderance of the evidence that he is being unlawfully held. *See Skaftouros*, 667 F.3d at 158. The district court must "ensur[e] that the applicable provisions of the treaty . . . are complied with." *Skaftouros*, 667 F.3d at 158 (quoting *U.S. ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 565 (2d Cir. 1963)). The court is not to simply provide a "rubber stamp" to the magistrate's extradition certification. *Id.*

## IV. DISCUSSION

The court begins with the question of dual criminality, and then turns to arguments concerning the statutes of limitations.

### A. Dual Criminality

The doctrine of dual criminality "requires that the offense charged be punishable as a serious crime in both countries." *U.S. v. Sensi*, 879 F.2d 888, 893 (D.C. Cir. 1989). The U.S.-Finland Extradition Treaty incorporates this requirement. The Treaty provides that "[a]n offense

shall be an extraditable offense if it is punishable under the laws of the requested and requesting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty." Protocol to the U.S.-Finland Extradition Treaty, Dec. 16, 2004, ECF No. 21-2 [hereinafter Treaty Protocol], at 8.

The central concern of the dual criminality inquiry is whether the person's conduct is punishable in both countries; it is not concerned with the particular legal contours of each country's criminal law. *See Sensi*, 879 F.2d at 894 ("The Restatement makes clear that the focus is on the *acts* of the defendant, not on the *legal doctrines* of the country requesting extradition.") (citing Restatement (Third) of Foreign Relations Law of the United States § 476, comment d (1987)) (emphasis added). As the Supreme Court stated in *Collins v. Loisel*, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if *the particular act charged* is criminal in both jurisdictions." 259 U.S. 309, 312 (1922) (emphasis added); *accord* Treaty Protocol at 8 ("an offense shall be considered an extraditable offense . . . regardless of whether the laws in the requesting and requested State place the offense within the same category of offenses or describe the offense by the same terminology").

This focus on *the particular act charged* requires the court to precisely identify the conduct underlying the foreign prosecution for which extradition is sought. And, once that conduct is identified, determine whether it would be criminally punishable in the United States. The court takes these inquiries in turn.

### 1. The Particular Act Charged

In front of Judge Robinson, the United States advanced two offenses under Finnish law as the basis of the extradition request: "aggravated fraud by a debtor, committed on January 24,

2002, or alternatively, aggravated dishonesty by a debtor, committed between January 1, 2000 and August 2, 2001." *See* Formal Extradition Request at 35. The United States advocated that the conduct comprising *either* charge satisfied the dual criminality requirement. Judge Robinson disagreed, finding that "the allegation that [Petitioner] transferred the shares 'knowing that due to his already existing and expected financial difficulties his act may harm the financial interests of his creditors,' does not rise to the level of a fraudulent scheme [under U.S. law]" and therefore aggravated dishonesty of a debtor is not an offense that satisfies the dual criminality requirement. *See In re Liuksila*, 74 F. Supp. 3d at 12 (citing Formal Extradition Request at 42). In this proceeding, the United States does not challenge that determination. Instead, it seeks extradition only on the other ground: aggravated fraud by a debtor. *See* Resp.'s Opp'n to Pet.'s Supp. Mem. [hereinafter Resp.'s Opp'n.], ECF No. 25, at 7–12; *see also* Hr'g Tr., Oct. 26, 2016, at 54.

As to the aggravated fraud charge, the parties disagree about the particular acts that comprise the offense. Petitioner believes that Finnish authorities have accused him of making "a compelled, unsworn, and unrecorded misrepresentation . . . in a private debt collection proceeding." Pet.'s Supp. Mem. at 1. The United States takes a broader view. It asserts that Petitioner is being extradited "for his efforts to engineer a fictitious sale of shares of real estate, *and* the false statements he made to a Finnish official in an attempt to conceal his misdeeds." Resp.'s Opp'n at 1 (emphasis added).

Petitioner has the better of the argument. Under Finnish law, aggravated fraud by a debtor occurs when "[a] debtor who, in order to obtain unlawful financial benefit for himself or herself or another *in bankruptcy, enforcement, debt adjustment or restructuring proceedings* conceals his or her property . . . [or] gives other false or misleading information on a circumstance that is significant from the point of view of the creditors." Formal Extradition Request at 53 (quoting

Fin. Crim. Code Ch. 39, Sec. 2) (emphasis added). The Finnish aggravated fraud statute thus criminalizes the giving of false or misleading testimony about information material to creditors "in" an official government proceeding—not the conduct that occurs outside of such proceedings.

In Petitioner's case, the charged conduct consists of the discrete act of making false statements to a bailiff during a debt enforcement proceeding concerning his purported sale of the stock holding company's shares. The Application for Summons made to the Turku District Court makes this clear. The Application identifies the offense of aggravated fraud by a debtor as having occurred on a single date—January 24, 2002, the date of the debt enforcement proceeding. *See* Formal Extradition Request at 42.[4] During that proceeding, Petitioner is accused of "[giving] false and misleading information on a circumstance that is significant from the point of view of the creditors," *id*. at 41, specifically "[Petitioner] has untruthfully announced that he has sold the shares . . . before the date of distraint . . . and that the bank had made the transaction on its own initiative," *id*. at 42. Further, Petitioner "was informed that provision of false information is a punishable criminal offense, a fraud by a debtor." *Id*. at 51. As these official Finnish records establish, the particular act for which extradition is sought is making false statements about the bona fides of the housing share sale, not the legality of the sales themselves.

The United States' position that the charged conduct is broader and involves the acts undertaken to execute the fraudulent conveyance is unconvincing. Recall, in these proceedings, the United States does not advocate that the alternative charge of *dishonesty* by a debtor is an extraditable offense. Yet, it is only this alternative charge that reaches Petitioner's alleged acts of fraudulently conveying the shares. Again, the Application for Summons makes this clear. It alleges that, for the offense of aggravated dishonesty by a debtor, Petitioner "without acceptable

---

[4] The court refers to the Application of Summons as part of the Formal Extradition Request in its citations based on the Table of Contents provided by the parties in their Joint Appendix, ECF No. 21.

reason transferred the shares . . . to the possession of the four companies administered by himself in order to place the shares beyond the reach of the creditors . . . ." Formal Extradition Request at 42. Additionally, the Application dates the "[t]ime of commission" of that offense as the period from "1 January 2000 [to] 2 August 2001." *Id.* Conversely, with regard to the charge of aggravated fraud, the charging documents, as discussed, refer only to events on January 24, 2002, the date of the debt enforcement proceeding. *Id.* at 35. Thus, the acts occurring *before* the debt enforcement proceeding and encompassing the broader scheme do not comprise the charged conduct for which extradition is sought.

The primary case on which the United States relies, *In re Zhenley Ye Gon*, to broaden the charged conduct is inapposite. *See* Resp.'s Opp'n at 8 (citing 768 F. Supp. 2d 69 (D.D.C. 2011)). The United States contends that the court in *Zhenley Ye Gon* considered "surrounding circumstances not essential to proof of the Mexican charge" of possession of firearms reserved for the military—the charge for which petitioner was being extradited. *Id.* Not so. There, the court specifically identified facts that were critical to its dual criminality assessment, such as the location of the weapons in rooms controlled by the petitioner and the nearby presence of drugs and money. *See Zhenley Ye Gon*, 768 F. Supp. 2d at 86–87. The court did not treat these facts as tangential, but rather, as facts bearing on whether the petitioner's conduct, if it had occurred in the United States, would violate federal and District of Columbia law. *Id.* Here, by contrast, the United States asks the court to find that the predicate conduct for the discrete charge of aggravate fraud of a debtor encompasses acts that go beyond the commission of the offense itself. *Ye Gon* does not support doing so.

The United States also suggests that the court can consider the acts constituting the alleged fraudulent conveyances as part of the charged conduct because evidence relating to those acts

would be admissible either as substantive evidence, presumably to show the falsity of Petitioner's statements, or under Federal Rule of Evidence 404(b) to prove his intent, plan, or absence of mistake. *See* Resp.'s Opp'n at 9–10. But the United States cites no case for the proposition that acts not constituting the offense itself but necessary to proving it can be bootstrapped into the dual criminality inquiry. The court therefore does not consider as part of the charged conduct any act other than Petitioner's making of false statements during the debt enforcement proceeding.

### 2. Whether There is a Comparable U.S. Crime

Having established Petitioner's charged conduct as false statements made during the debt enforcement inquiry, the court must decide whether such conduct is criminal in the United States. Despite a habeas proceeding's general burden on petitioner, it is fair to place the initial burden on the United States to identify a comparable domestic crime. The petitioner should not have to guess at which of the myriad of federal or state criminal laws his foreign conduct purportedly would violate if committed domestically. Here, the United States has identified two possible violations: making a false statement to a government official under 18 U.S.C. § 1001, or mail and wire fraud under 18 U.S.C. §§ 1341, 1343. Resp.'s Opp'n at 7–13.[5] As these are habeas proceedings, the petitioner bears the burden of demonstrating by a preponderance of evidence that his foreign conduct is *not* unlawful under the statutes identified by the United States. *See Skaftouros*, 667 F.3d at 158.

The D.C. Circuit's decision in *Sensi* illustrates how courts should conduct the dual criminality inquiry. The defendant in *Sensi* was extradited to the United States from the United Kingdom to face charges of mail fraud and interstate transportation of stolen property, based on

---

[5] The United States argued a broader set of U.S. law violations during the extradition proceedings. At different points, the United States argued Petitioner's conduct could constitute (1) bankruptcy fraud, 18 U.S.C. § 152; (2) mail and wire fraud, 18 U.S.C. §§ 1341, 1343; (3) lying to a government official, 18 U.S.C. § 1001; or (4) fraud under the District of Columbia law, D.C. Code § 22-3221. *See In re Liuksila*, 74 F. Supp. 3d at 10.

his alleged theft of large sums of money from his employer. *See Sensi*, 879 F.2d at 891. The Circuit rejected Sensi's hyper-technical reading of the dual criminality principle, stating that a "perfect congruence" of the law is not required. *Id.* at 894. What matters for purposes of the dual criminality inquiry is the defendant's conduct. Thus, in *Sensi*, the court did not dwell on the elements of mail fraud or interstate transportation of stolen property, but instead considered whether there was a British analog to "stealing." *Id.* at 893. Viewed in that way, the dual criminality requirement was easily satisfied. *Id.*

### a. Lying to a Government Official

In this case, the essence of Petitioner's charged conduct is the making of a material false statement in connection with an official government proceeding. Such conduct, were it to occur in the United States, is clearly proscribed by 18 U.S.C. § 1001. That statute criminalizes "any materially false, fictitious, or fraudulent statement or representation" that is made "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government," although it expressly excludes statements made during a judicial proceeding. 18 U.S.C. § 1001. Petitioner's alleged conduct of lying to the bailiff during the debt-collection proceedings readily correlates with the type of conduct outlawed by section 1001.

Petitioner makes a host of arguments to avoid this conclusion, but none are convincing. *First*, Petitioner argues that section 1001 provides an inapt analog to the Finnish charge because "a Finnish debt enforcement inquiry has no parallel in American law." Pet.'s Supp. Mem. at 10–14. Such proceedings, Petitioner insists, are convened for no purpose other than "to collect on a private debt," a construct that "is repugnant to our basic principles." *Id.* at 11. Petitioner is, of course, correct that there is nothing in the United States that resembles a Finnish debt enforcement proceeding. But that fact is not dispositive. So long as "the laws of both the requesting and

requested party appear to be directed to the same basic evil" the principle of dual criminality is satisfied. *Clarey v. Gregg*, 138 F.3d 764, 766 (9th Cir. 1998) (internal quotation marks and citation omitted). Here, both the U.S. and Finnish laws at issue make it unlawful to make material false statements in proceedings over which the government has jurisdiction. It matters not that the jurisdiction of the Finnish government sweeps more broadly than that of federal and state governments in this country. *Cf. id.* at 765–66 (holding that Mexican homicide statute that covered a broader range of conduct did not defeat dual criminality). Both the Finnish aggravated fraud by a debtor statute and section 1001 punish acts of the same general character and both are directed at the same evil—making false statements in a government proceeding. Thus, the absence of something akin to a debt enforcement inquiry in the United States does not defeat dual criminality.

*Second*, Petitioner seeks refuge under 18 U.S.C. § 1001(b), which removes from the scope of section 1001 a "party to a judicial proceeding . . . for statements, representations, writings or documents submitted by such party . . . to a judge or magistrate in that proceeding." 18 U.S.C. § 1001(b). Petitioner argues that "[a] debt enforcement inquiry is conducted in a manner typical of a judicial proceeding under Finnish law" and its function—to collect judgment debts—"has long been understood as the province of the judicial branch under U.S. law." Pet.'s Supp. Mem. at 12. As support for its position, Petitioner notes that the bailiff, the official who conducts the debt enforcement inquiry, enjoys some discretion in decision-making and is required to produce a written decision that is subject to appeal by a higher tribunal. *See id.* Petitioner supports these assertions with an opinion from his Finnish law expert, Dr. Jussi Tapani. *See* Letter from Dr. Jussi Tapani, ECF No. 21-1, at 87–90 *and* Declaration from Dr. Jussi Tapani, ECF No. 24-1, Ex. 22, at 1–5.

After careful review of Dr. Tapani's opinion, the court finds that Petitioner has not carried his burden to prove by a preponderance of evidence that a statement made during a Finnish debt enforcement proceeding is comparable to the kind of statement in domestic judicial proceedings that falls within section 1001(b). Congress adopted the judicial proceeding exemption "so as to avoid any chilling effect upon the adversarial process." *See* H.R. Rep. No. 104-680 at 2 (1996). Congress noted that the exception was intended to codify the judicial function exception to section 1001 that the courts had developed as "necessary to safeguard from the threat of prosecution statements made in the court of adversarial litigation." *Id.* at 4. To allow the prosecution of statements made in the course of litigation, Congress reasoned, "would chill vigorous advocacy, thereby undermining the adversarial process." *Id.; see also Hubbard v. U.S.*, 514 U.S. 695, 717 ("There remains, however, a serious concern that the *threat* of criminal prosecution under the capacious provisions of § 1001 will deter vigorous representation of opposing interests in adversarial litigation.") (Scalia, J., concurring). Thus, although section 1001 does not define the term "judicial proceeding," the statute's history makes clear that Congress viewed a proceeding to be "judicial" if it was, at minimum, characterized by the adversarial process.

The Finnish debt enforcement inquiry lacks the kind of adversity before a judicial officer that would make it akin to a "judicial proceeding" in the United States. Petitioner's expert, Dr. Tapani, does not describe the debt enforcement proceeding to involve an adversarial process. To the contrary, he describes it to be a "somewhat informal proceeding" that occurs *after* a court judgment on the debt. *See* Letter from Dr. Jussi Tapani, ECF No. 21-1, at 89. The debtor is not placed under oath, and the proceeding "generally [does not] result in the discharge or release of the debtor's debts." *Id.* And he does not say that an adverse party participates in the proceedings. Dr. Tapani's description is consistent with one supplied by the Finnish government. *See* Resp.'s

Opp'n, Ex. A, ECF No. 25-1, at 2 (describing a debt enforcement proceeding as "closely linked to court proceedings," but in fact, "an independent administrative procedure subsequent to court proceedings"). Moreover, the bailiff is not like a judicial officer in the United States. Dr. Tapani states that he is "an employee of the executive branch." Declaration of Dr. Jussi Tapani, ECF No. 24-1, at 3. His job is to question the debtor about what assets may be used to "satisfy the creditor's judgment . . . [in] an attempt to seek the debtor's assets." *See* Letter from Dr. Jussi Tapani, ECF No. 21-1, at 89.[6] Thus, his role is primarily that of an inquisitor, not a neutral who decides between opposing parties. In that way, a bailiff's role is similar to that of an American bankruptcy trustee. *See* 11 U.S.C. § 704(a)(4) (2010) (authorizing bankruptcy trustees to "investigate the financial affairs of the debtor"). Lying to a bankruptcy trustee is actionable under 18 U.S.C. § 1001. *See U.S. v. Palmisano*, 185 B.R. 476 (D. Vt. 1995). Petitioner therefore cannot avoid extradition based on the judicial proceedings exception contained in section 1001.

*Third,* Petitioner argues that he cannot be extradited because the "Finnish proceedings conducted in this case also lacked the requisite procedural protections to form the basis of a charge for false statements under U.S. law." Pet.'s Supp. Mem. at 13. Petitioner claims three such procedural violations: (1) the Finnish "summons" fails to identify with specificity the false statements Petitioner is alleged to have made, in the same manner as would a grand jury indictment under U.S. law; (2) Finnish authorities violated Petitioner's rights under Finnish law by not affording him the opportunity to review "a written protocol" of the debt enforcement proceedings, so that he could review the accuracy of his responses; and (3) Petitioner had no right against self-

---

[6] In his interview with the U.S. Attorney's Office in 2006, Petitioner conceded that the bailiff did not have the same powers as a judge. *See* Interview Memo., ECF No. 21-1, at 147–48. As he put it, "[t]he bailiff is under Finnish law a mere employee of the government and can not [*sic*] interpret court ordered decrees or judgements in any way at all, and according to law, has to advise the creditor to go back to the court that issued the judgement even in the case of minor writing error." *Id.* at 148.

incrimination in the debt enforcement proceeding, a deficiency the European court of Human Rights and the Finish Supreme Court later recognized as violative of a debtor's rights. *See id.* at 13–14. None of these arguments is persuasive.

As to the first, Petitioner cites to no provision of the U.S.-Finland Extradition Treaty nor to any legal authority that renders an extradition unlawful simply because the requesting country's charging instrument does not satisfy the notice standards of the requested country. Even if there were such a requirement, the Finnish charging papers are sufficient to place Petitioner on notice of his alleged false statements. The Application for Summons provides that Petitioner "has untruthfully announced that he has sold the shares . . . to [three entities] before the date of distraint . . . and that the bank had made the transaction on its own initiative." Formal Extradition Request at 42. Therefore, Petitioner is on notice about what Finnish authorities allege were false statements.

With respect to his contention that his particular debt enforcement proceeding did not conform with Finnish law by failing to provide a written protocol, it is not the province of this court to make such an inquiry. "[D]istrict judges considering habeas petitions challenging extradition orders [] should not engage in an analysis of the demanding country's laws and procedure, except to the limited extent necessary to ensure that the requirements of the federal extradition statute and the applicable extradition treaty have been satisfied." *Skaftouros*, 667 F.3d at 156; *accord Santos v. Thomas*, 830 F.3d 987, 1039 (9th Cir. 2016) ("Nor may a judge entertain challenges that a requesting country has not followed its own laws in bringing a criminal case or extradition request."). Petitioner makes no argument here that the failure of the Finnish authorities to follow its own procedures violated the U.S.-Finland Extradition Treaty or the federal extradition law.

Finally, as to Petitioner's complaint that he enjoyed no right against self-incrimination in the debt enforcement proceeding, nothing in the Treaty or the law requires as a precondition of extradition that the petitioner enjoyed in the requesting country the same rights afforded by the requested country.  Indeed, the opposite is true.  Courts consistently have held that the absence of comparable rights in the requesting country is no bar to extradition.  *Cf. Holmes v. Laird*, 459 F.2d 1211, 1219 (D.C. Cir. 1972) (holding in the context of an extradition proceeding to face trial in a foreign country, "a surrender of an American citizen required by treaty for purposes of a foreign criminal proceeding is unimpaired by an absence in the foreign judicial system of safeguards in all respects equivalent to those constitutionally enjoined upon American trials"); *accord Hilton v. Kerry*, 754 F.3d 79, 89 (1st Cir. 2014).  In his supplemental reply brief, Petitioner slightly modifies this argument to suggest that, in the absence of a right against self-incrimination, a compelled statement, even if false, cannot form the basis for liability under section 1001.  Pet.'s Supp. Reply, ECF No. 26, at 10 (arguing that "statements given under actual compulsion . . . cannot properly fall within Section 1001's ambit").  But the Supreme Court in *United States v. Brogan* flatly rejected the notion that the Fifth Amendment right against self-incrimination "confers a privilege to lie."  522 U.S. 398, 404 (1998).  Thus, the mere fact that Petitioner's debt enforcement proceeding did not afford him the right to remain silent does not relieve him of responsibility for uttering a falsehood.

Accordingly, for the reasons stated, the court finds that Petitioner has failed to carry his burden of demonstrating that the charged conduct underlying the offense of aggravated fraud on a debtor does not satisfy the dual criminality principle.

b.     Mail and Wire Fraud

In the interest of completeness, the court concludes that Petitioner's charged conduct would *not* constitute a crime under the federal mail and wire fraud statutes.  Central to any charge of mail or wire fraud is the existence of a "scheme or artifice to defraud."  18 U.S.C. §§ 1341, 1343; *see also U.S. v. Coughlin*, 610 F.3d 89, 97 (D.C. Cir. 2010).  A "scheme" is a "systemic plan . . . [or] artful plot or plan, usually to deceive others."  BLACK'S LAW DICTIONARY (10th ed. 2014).  Likewise, an "artifice" is a "clever plan or idea, especially one intended to deceive."  *Id*.

Petitioner's charged conduct here—the misrepresentation made on January 24, 2002, during the debt enforcement inquiry—does not constitute a systematic or clever plan to deceive.  It was a one-time misrepresentation.  Of course, fraud may be found from "a series of isolated acts."  *Deaver v. United States*, 155 F.2d 740, 744 (D.C. Cir. 1946).  But the court does not view Petitioner's charged conduct as a "series" of acts taken with intent to defraud.  *Cf. Nassan v. United States*, 126 F.2d 613, 615 (4th Cir. 1942) (finding scheme to defraud based on isolated acts because the misrepresentations were so numerous that "in their totality properly justify an inference of fraudulent intent").  The court might feel differently if Petitioner's fictitious sale occurred *after* the distraint of his assets.  Say, for example, Petitioner received the notice of distraint, used fictitious sales to hide his assets, and then lied about possessing those assets.  The false statement in that setting arguably would be an act in furtherance of a scheme to defraud.  But that did not happen here.  Instead, Petitioner fictitiously sold the housing shares on January 1, 2000, and then over sixteen months later, on May 8, 2001, the government notified him that it had distrained his assets.  *See* Formal Extradition Request at 42, 51.  Given that large gap in time, it is not reasonable to infer that Petitioner conducted the 2000 sale as part of a plan to lie during an unforeseen future debt enforcement proceeding.  Thus, for the purpose of satisfying the dual criminality requirement,

Petitioner's charged conduct is not analogous to the type of conduct proscribed by the mail and wire fraud statutes.

**B.      Statute of Limitations**

The court now turns to Petitioner's contention that the Finnish charges against him are time barred, thereby rendering extradition unlawful.   The U.S.-Finland Extradition Treaty forbids extradition if the statute of limitations has lapsed either under Finnish or U.S. law.   The Treaty provides: "Extradition shall be refused if the prosecution or the enforcement of the penalty for the offense for which extradition is requested has become barred by lapse of time according to the law of the requesting or requested State."   Extradition Treaty between the United States of America and Finland, June 11, 1976, ECF No. 21-2, at 20 [hereinafter Extradition Treaty].   Thus, the court must decide whether Petitioner has shown by a preponderance of evidence that the limitations period in either Finland or the United States has expired for the charged offense.  *Cf. Skaftouros*, 667 F.3d at 161.

*1.      Finnish Statute of Limitations*

In Finland, the statute of limitations for aggravated fraud by a debtor is ten years.  *See* Letter from Mary Ellen Warlow, ECF No. 21-2, at 81.   Finnish law provides that the limitations period starts to run from the date of offense and tolls "when the person to be prosecuted [h]as been given lawful notice of the summons or a request for his or her punishment has been made when he or she is personally present at a trial."  *Id.*   Here, Petitioner is alleged to have committed the offense of aggravated fraud by a debtor on January 24, 2002.   Thus, unless tolled, the limitations period would have expired on January 24, 2012.   But, according to Finnish authorities, the statute did toll seven-and-a-half years after the offense, on June 26, 2009, when the United States represented to Finnish authorities that it had served Petitioner with the summons.   *See* Letter from Julani Korhonen, ECF No. 21-2, at 78–80, 84.   Based on that representation, the Government of Finland

indicated it was "satisfied that service of the summons on Mr. Liuklisa was effected in accordance with the laws of Finland," and correspondingly the District Court in Turku determined that "the statute of limitations was tolled as prescribed by law." *Id.* at 79.[7]

Petitioner urges this court to find that the Finnish statute did not toll for two reasons. First, he argues that the court "is not required to accept the Finnish court's statement that Mr. Liuksila had been served" in accordance with Finnish law. Pet.'s Supp. Mem. at 15. That position, however, runs aground of the D.C. Circuit's pronouncement that "U.S. courts will defer to the judgment of foreign courts construing their own laws." *United States v. Trabelsi*, 845 F.3d 1181, 1192 (D.C. Cir. 2017); *cf. Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. __, __, 138 S. Ct. 1865, 1869 (2018) ("A federal court should accord respectful consideration to a foreign government's submission, but is not bound to accord conclusive effect to the foreign government's statements."). Petitioner offers no evidence, in the form of a legal opinion or otherwise, that would allow the court to reach a different conclusion than the Finnish court did about its own law.

Second, Petitioner challenges whether he in fact received service of the summons. He points out that the only evidence corroborating the United States' representation of service to the Government of Finland is "an undated, unauthenticated postal receipt." Pet.'s Supp. Mem. at 15; *see* Certified Mail Postal Receipt, ECF No. 21-2, at 86. Such evidence, he contends, is not sufficient to establish service and the consequent tolling of the Finnish statute of limitations. That argument has it precisely backwards. In these proceedings, Petitioner is presumed to have been served, and the burden rests on him to prove otherwise. *See Skaftouros*, 667 F.3d at 162–63. On that score, Petitioner comes up empty. Petitioner puts forth no evidence—not even his own

---

[7] As the quoted text shows, Petitioner mistakenly asserts that "the Finnish court did not decide that Mr. Liuksila had been served in accord with Finnish law . . . but simply noted that Mr. Liuksila had 'been summoned as a defendant to a court session held on 16 November 2009.'" Pet.'s Supp. Mem. at 15.

affidavit—that would support a finding that he was never served. Notably, the Certified Mail Postal Receipt that Petitioner maligns contains a signature affirming receipt of the mailing, presumably the summons. Petitioner does not deny the signature as his own.

Without any evidence to conclude otherwise, the court finds that the Finnish statute of limitations did not lapse.

### 2. *U.S. Statute of Limitations*

Whether the five-year limitations period expired under U.S. law, *see* 18 U.S.C. § 3282, presents a more interesting question. The Finnish government filed charges against Petitioner on October 23, 2007—five years and nine months after Petitioner's appearance at the debt enforcement inquiry. *See* Letter from Juhani Korhonen, Finland Ministry of Justice, ECF No. 21-1, at 82. Therefore, absent tolling, the limitations period for the Finnish charges under U.S. law would have lapsed.

### a. The mere absence rule applies

Whether the U.S. limitations period tolled turns on the application of 18 U.S.C. § 3290. Titled "Fugitives from Justice," the statute succinctly provides: "No statute of limitations shall extend to any person fleeing from justice." 18 U.S.C. § 3290. Nearly 80 years ago, the D.C. Circuit interpreted the statutory precursor to section 3290 in *McGowen v. United States.* In *McGowen*, shortly after he committed the alleged crime of forgery, the defendant left the District of Columbia and remained absent for more than three years—the then-federal limitations period—during which time he was mostly in prison in Virginia. *See* 105 F.2d at 791–92. The Circuit stated that,

> [t]o be a fugitive from justice . . . it is not necessary that the party charged should have left the state in which the crime is alleged to have been committed, after an indictment found, *or for the purpose of avoiding a prosecution anticipated or begun*, but simply that

having within a state committed that which by laws constitutes a crime, when he is sought to be subject to its criminal process to answer for his offence, he has left its jurisdiction, and is found within the territory of another.

*Id*. at 792 (emphasis added). Applying those principles, the Circuit found that,

when [the defendant] left the District after committing forgery, [he] was a 'person fleeing from justice,' regardless of his motive in leaving. . . . The question is not whether he remained out of the District for any particular reason, or at all; it is enough that he did not remain for three years within the District.

*Id.*

*McGowen* articulates what has come to be known as the "mere absence" rule. The Circuit has applied that rule in subsequent cases. *See Green v. United States*, 188 F.2d 48, 48 (D.C. Cir. 1951) ("The statute of limitations, on which he relies, did not run during his absence [from the District]. This is true even if he did not, as apparently he did, leave to avoid prosecution."); *see also Taylor v. United States*, 238 F.2d 259, 260 (D.C. Cir. 1956) (foreclosing statute of limitations defense based on *McGowen* and *Green*). Applied here, the mere absence rule works to Petitioner's detriment. It does not matter why he left Finland. It only matters that he left prior to the five-year limitation period's expiration and, once he did, the limitations period automatically tolled. What's more, it remains tolled to this day, as he has never returned to Finland, thereby making the Finnish prosecution timely under U.S. law.

The mere absence rule adopted by the D.C. Circuit represents a decidedly minority construct of section 3290. The vast majority of the other Circuit courts—ten to be precise—hold that a person is "fleeing from justice" only if his absence is motivated by an intent to avoid prosecution or punishment.[8] That is also how the Supreme Court viewed it more than a century

---

[8] *See Brouse v. United States*, 68 F.2d 294, 295 (1st Cir. 1933) (including intent to avoid punishment as part of fleeing from justice); *United States v. Florez*, 447 F.3d 145, 151 (2d Cir. 2006) (same); *United States v. Livingston*, 404 F. App'x 685, 690 (3d Cir. 2010) (same); *United States v. Brown*, 374 F. App'x 450, 452 (4th Cir. 2010) (same);

ago, when it interpreted the phrase "fleeing from justice" as contained in a statutory predecessor to section 3290. *See generally Streep v. United States*, 160 U.S. 128 (1895). Indeed, as explained below, in the court's view, *McGowen*'s erroneous reading of section 3290 stems from a fundamental misreading of *Streep*.

Petitioner urges the court not to follow *McGowen*, arguing that it "retains no validity today." Pet.'s Mem. at 16. For support, Petitioner points to the above-cited cases from outside this Circuit, which interpret "fleeing from justice" to include an element of intent. Those decisions, however, no matter how persuasive, do not grant the court license to disregard D.C. Circuit precedent. *See United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997) ("That a district judge disagrees with circuit precedent does not relieve him of this obligation whether or not the precedent has been embraced by our sister circuits.").

Recognizing the roadblock presented by *McGowen*, Petitioner tries to avoid it by maintaining that a later D.C. Circuit case, *United States v. Singleton*, adopted a "contradictory holding" to *McGowen*. Pet.'s Mem. at 18. In *Singleton*, the defendant remained *within* the District of Columbia while evading authorities, so the question before the court was whether a person could be "fleeing from justice" under section 3290 without physically leaving the jurisdiction. 702 F.2d 1159, 1169 (D.C. Cir. 1983). The court held that "flight from the jurisdiction is not required to trigger the tolling provision," but in that case found that "the Government failed to show that Singleton acted with the intention of avoiding prosecution." *Id.* at 1169, 1170. Though *Singleton* recognized that "fleeing from justice" *inside* a jurisdiction necessitates an intent to evade

*Donnell v. United States*, 229 F.2d 560, 562–65 (5th Cir. 1956) (same); *United States v. Greever*, 134 F.3d 777, 780 (6th Cir. 1998) (same); *United States v. Gibson*, 490 F.3d 604, 608 (7th Cir. 2007) (same); *Man-Seok Choe v. Torres*, 525 F.3d 733, 741 (9th Cir. 2008) (same); *Ross v. U.S. Marshal for Eastern Dist. of Oklahoma*¸ 168 F.3d 1190, 1194 (10th Cir. 1999) (same); *United States v. Fonseca-Machado*, 53 F.3d 1242, 1244 (11th Cir. 1995) (same). *But see Matter of Assarsson*, 687 F.2d 1157, 1162 (8th Cir. 1982) (ruling intent to avoid prosecution not required, but intent found nonetheless).

prosecution, the court explicitly left for another day whether to revisit the mere absence rule of *McGowen* for defendants found *outside* of the jurisdiction.

> These cases [i.e., *McGowen* and *Green*], both involving defendants who had left the District of Columbia, suggest that the defendant's intent is irrelevant in determining whether he has fled justice . . . In this case, the Government has offered no proof that appellee left the jurisdiction. It is therefore unnecessary for us to decide whether the rule of law set forth in these early cases—that mere absence from the jurisdiction is sufficient to toll the statute—retains its vitality today.

*Id.* at 1169 n.32 (citation omitted). *McGowen*, therefore, remains the law to which this court is bound. And it applies directly to this case because Petitioner left Finland—the jurisdiction in which he allegedly committed the crime—thereby tolling the U.S. limitations period. It matters not why he left.

Next, Petitioner grapples with the reality of *McGowen* as binding precedent but tries to distinguish it. He argues that *McGowen* was not an extradition case "governed by congressionally ratified treaties." Pet.'s Mem. at 20. Pointing out that the U.S.-Finland Extradition Treaty expressly forbids extradition upon the expiration of either country's statute of limitations, Petitioner maintains that applying *McGowen*'s mere absence rule here "would entirely undo the congressional purpose of including the U.S. limitations requirement in the Treaty in the first place." *Id.* at 21. That consequence arises, Petitioner insists, because an extraditee will always, by nature, be outside the requesting jurisdiction and therefore can never benefit from the Treaty's protection against stale prosecutions if the mere absence rule applies. *Id.*; *see also* Pet.'s Supp. Mem. at 5. To avoid this purported conflict, he urges the court to read section 3290 as requiring an intent to evade justice to toll the limitations period. *See id.*

These arguments suffer from two problems. First, the Treaty between Finland and the United States forbids extradition if the penalty has "become barred by lapse of time *according to*

*the law of the . . . requested State.*" Extradition Treaty at 20. Thus, to determine whether time has lapsed, the court must look to the law of the United States, which includes section 3290 and the cases interpreting it. *See e.g., Man-Seok Choe v. Torres*, 525 F.3d 733, 741 (9th Cir. 2008) (applying section 3290 to extradition proceedings); *Ross v. U.S. Marshal for Eastern Dist. of Oklahoma*, 168 F.3d 1190, 1193–94 (10th Cir. 1999) (same); *Jhirad v. Ferrandina*, 536 F.2d 478, 483 (2d Cir. 1976) (same). The Treaty does not contemplate a special application of the requested country's law during an extradition proceeding. Second, as a practical matter, Petitioner is wrong that someone who leaves Finland and is found in the United States can *never* benefit from this country's statute of limitations period if the mere absence rule applies. If Petitioner had left Finland more than five years after the alleged crime—instead of four—the U.S. statute of limitations would have lapsed, and the Treaty's limitation provision would have protected Petitioner. Although it did not aid Petitioner here, the Treaty's protection has power, notwithstanding *McGowen*, for those who remain in the jurisdiction where the offense took place for at least five years.

Relatedly, the court does not agree with Petitioner that applying *McGowen* "transgress[es]" the Treaty through inconsistent administration of section 3290. Pet.'s Supp. Mem. at 6. The fact that an intent to avoid prosecution is required when someone is found in Arlington, Virginia or New York City, but is not in Washington D.C., is a result of the U.S. bedrock principle allowing federal Circuit Courts of Appeals to reach different legal conclusions on American law. *See, e.g.*, Arthur M. Brown, *Comity in the Federal Courts*, 28 HARV. L. REV. 589, 590 (1914) ("Each District Court is independent of every other District Court, each Circuit Court of Appeals of every other Circuit Court of Appeals."). Different legal rulings by federal Circuit Courts about a U.S. statute does not clash with international law. *Cf. Zhenli Ye Gon v. Holder*, 992 F. Supp. 2d 637,

663 n.14 (W.D. Va. 2014) (in an extradition case, applying binding Fourth Circuit precedent about a U.S. statute despite a Circuit split on the question).

Finally, Petitioner argues that *McGowen* is inapposite on the facts. *See* Pet.'s Mem. at 22–23. He says that his case is distinguishable because, unlike the defendant in *McGowen*, he took affirmative steps to notify both U.S. and Finnish authorities of his intention to depart Finland and the Finnish authorities always knew his whereabouts in Washington, D.C., after he left. *See id.* But these factual distinctions do not immunize Petitioner from the effect of *McGowen*. Under the mere absence rule, upon his departure from Finland in 2006, the U.S. statute of limitations stopped running. Although Petitioner makes a strong case that he left Finland for reasons other than to flee from justice, that fact is immaterial under *McGowen*.[9] Petitioner therefore cannot claim the Treaty's statute of limitations protection under U.S. law.

### b. The D.C. Circuit should revisit *McGowen*

Though this court has never said so before, it feels compelled to say so here: It respectfully submits that Circuit precedent was wrongly decided and urges the D.C. Circuit to revisit it. *McGowen* should be left to the dustbin of history for a host of reasons.

First, the mere absence rule is inconsistent with the plain text of section 3290. *See King v. Burwell*, 576 U.S. ___, 135 S. Ct. 2480, 2489 (2015) ("If the statutory language is plain, we must enforce it according to its terms."). The key phrase in section 3290 is, of course, "fleeing from justice." 18 U.S.C. § 3290. The common understanding of "flee" is "to run away or escape *from danger, pursuit, or unpleasantness; to try to evade a problem*." BLACK'S LAW DICTIONARY (10th

---

[9] To be clear, the court does not make a factual finding about Petitioner's intent when leaving Finland. Such a finding is unnecessary in light of the court's conclusion that it is bound by *McGowen*.

ed. 2014) (emphases added).[10]  Consistent with that meaning, Black's Law Dictionary defines the phrase "flee from justice" as "[t]he act or instance of fleeing, *especially to evade arrest or prosecution*." *Id.* (emphasis added).  Further, the title of section 3290—"Fugitives from justice"— is instructive.  *Cf. Yates v. United States*, 574 U.S. ___, ___, 135 S. Ct. 1074, 1083 (2015) (explaining that a statutory title can "supply cues" of Congress's intent).  A "fugitive" is understood to be "[a] criminal suspect or a witness in a criminal case who *flees, evades, or escapes arrest, prosecution, imprisonment, service of process, or the giving of testimony*."  BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added).[11]  These definitions comport with common sense.  One does not "flee" from the long arm of the law, nor is one a "fugitive," simply by physically departing from a location.  An element of intent is essential to constitute "flight" or "fugitive" status.  By making flight an act of strict liability, *McGowen* contradicts the plain meaning of "fleeing from justice."

An element of intent is also consonant with section 3290's purpose.  Statutes of limitations exist for two reasons:  to ensure accurate adjudication with contemporaneous evidence and to offer repose to a suspect.  *See, e.g.*, *United States v. Kubrick*, 444 U.S. 111, 117 (1979).  To ensure accurate adjudication, prosecutors must gather evidence and bring an indictment within five years.  *See* 18 U.S.C. § 3282.  If a suspect evades justice, he places an unfair burden on law enforcement to locate him during the investigation or to bring him before a tribunal.  The suspect cannot benefit by creating such delay.  *See Streep*, 160 U.S. at 133 ("[I]t is quite clear that any person who takes himself out of the jurisdiction with the intention of avoiding being brought to justice for a particular

---

[10]  Similarly, Merriam-Webster defines "flee" as "to run away from danger or evil."  MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/flee.  Oxford defines "flee" as to "run away from a place or situation of danger."  OXFORD DICTIONARY, https://en.oxforddictionaries.com/definition/flee.

[11]  Merriam-Webster defines "fugitive" as "running away or intending flight."  MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/fugitive.  Oxford defines "fugitive" as "a person who has escaped from captivity or is in hiding."  OXFORD DICTIONARY, https://en.oxforddictionaries.com/definition/fugitive.

offense, can have no benefit of the limitation . . . ."); *see also United States v. Marshall*, 856 F.2d 896, 900 (7th Cir. 1988) ("The tolling statute reflects the congressional belief that where the defendant impedes the discovery and prosecution of his criminal conduct by 'fleeing from justice,' his right to avoid prosecution for distant offenses is diminished while the government's need for additional discovery time is strengthened."). But if a person merely leaves the jurisdiction, without the intent to evade justice, presumably he will return or can be located. In that instance, "the accused should not be held responsible for a delay caused by 'an open move to a new residence where [he] is readily accessible to *careful* law enforcement officers.'" *Singleton*, 702 F.2d at 1169 (quoting *United States v. Wazney*, 529 F.2d 1287, 1289 (9th Cir. 1976)). The right of repose should take priority in that instance. *See Marshall*, 856 F.2d at 900 ("There is insufficient justification, however, for disregarding the defendant's right of repose where he openly leaves the indicting jurisdiction or relocates his home while remaining accessible to discovery and prosecution without the intent to avoid arrest or prosecution."). Requiring intent, therefore, balances the statute of limitations' dual purposes of accurate adjudication and repose.

*McGowen* also conflicts with the Supreme Court's decision in *Streep*. Section 3290 has its roots in a statute enacted by Congress in 1790, which also denied benefit to "any person or persons fleeing from justice." *Streep*, 160 U.S. at 134–35 (citing Act April 30, 1970, c. 9, § 32 (1 Stat. 119)). Called upon to interpret a successor to the 1790 statute—"section 1045 of the Revised Statutes"—which also contained the exact same phrase "fleeing from justice," the Court held:

> It is unnecessary, for the purposes of the present case, to undertake to give an exhaustive definition of these words; for it is quite clear that any person who takes himself out of the jurisdiction, *with the intention of avoiding being brought to justice for a particular offense*, can have no benefit of the limitation, at least when prosecuted for that offense in a court of the United States.

> In order to constitute a fleeing from justice, it is not necessary that the course of justice should have been put in operation by the presentment of an indictment by a grand jury, or by the filing of an information by the attorney for the government, or by the making of a complaint before a magistrate. *It is sufficient that there is a flight with the intention of avoiding being prosecuted*, whether a prosecution has or has not been actually begun.

*Id.* at 133 (emphasis added). With this understanding of "flight" in mind, the Court held that a flight from justice of a *state* prosecution was sufficient to toll the limitations period as to a *federal* prosecution. *See id.* at 134.

The mere absence rule of *McGowen* cannot be squared with the holding of *Streep*. If "fleeing from justice" was understood to include an element of intent in 1895, the same must be true of the successor statute, 18 U.S.C. § 582 (1939), which the Circuit confronted in *McGowen*. The error in *McGowen*, the court respectfully submits, arose from the Supreme Court in *Streep* attempting to equate the tolling statute with the text of the federal extradition statute, which contains no intent requirement.[12] *See McGowen*, 105 F.2d at 792 (stating its mere absence rule and then observing "[t]he Supreme Court first used that language with regard to the extradition law, but afterwards expressly applied it to the statute here involved," citing *Streep*); *see also Donnell v. United States*, 229 F.2d 560, 564 (5th Cir. 1956) (explaining that the mere absence rule "is based, we apprehend, to some extent upon [the] effort to invest the words of Section 3290 with the same meaning as that given by the court to similar language in the extradition statute") (citations omitted); *see also Appleyard v. Commonwealth of Massachusetts*, 203 U.S. 222, 229–30 (1906) (in dicta, interpreting *Streep* to have equated the tolling statute with the federal

---

[12] The federal extradition statute also uses the terms "fugitive from justice" and "fled." *See* 18 U.S.C. § 3182 (1996). Yet, it does not have an intent requirement because the statute is concerned merely with transferring out-of-state suspects to the requesting state. The suspect's mere absence from the requesting state is all that matters in that context. Tolling the statute of limitations presents an entirely different situation. *See Donnell v. United States*, 229 F.2d 560, 564 (5th Cir. 1956).

extradition statute). But a complete reading of *Streep* makes clear that, when the Court interpreted the tolling statute, it required an intent to evade prosecution. *See generally Whether an Accused is 'Fleeing from Justice' so as to Toll the Statute of Limitations Depends Upon His Intent and is a Question of Fact for the Jury*, 104 U. Pa. L. Rev. 1111 (1956). As the Seventh Circuit stated in *Marshall*: "Taken in context, *Streep* merely indicates that just as flight before the initiation of prosecution requires extradition, so too does preindictment flight trigger the tolling statute. *Streep* does not implicate the extradition statute's nonintent-based standard under the tolling statute." 856 F.2d at 899. In the end, *McGowen* simply cannot be squared with *Streep*'s reading of "fleeing from justice" in the tolling statute to require an element of intent.

Since the Circuit's decision in *McGowen*, every other circuit, save one, has required that a person have an intent to evade prosecution to trigger tolling under section 3290, with some circuits recognizing and explicitly rejecting the mere absence rule. *See* n. 8 *supra*. The result of this divide yields obvious inequity and unfairness. If a person leaves a foreign country with no intent to avoid prosecution and happens to put down stakes most anywhere in the United States, he will enjoy repose from a foreign prosecution upon the passage of five years. Not so for the person that moves to the District of Columbia. For him, he will remain at risk of foreign prosecution so long as he remains in the District. That result does not comport with our sense of justice. *See Order of Railroad Telegraphers v. Railway Express Agency*, 321 U.S. 342, 348–49 (1944) ("Statutes of limitation . . . in their conclusive effects are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.").

For these reasons, the court believes the D.C. Circuit should overturn *McGowen*'s mere absence rule and instead adopt a requirement of intent to avoid prosecution to toll the statute of

limitations under section 3290.  Doing so would give proper meaning to the text and purpose of section 3290—while fairly balancing the statute of limitations' dual interests in speedy adjudication and repose for a suspect.  Further, it would bring this Circuit's law in harmony with ten other sister Circuits.  And, it likely would produce the just outcome for Petitioner in this case.

## V.  CONCLUSION

For the reasons set forth above, Petitioner's Petition for a Writ of Habeas Corpus is denied.  A separate final, appealable order accompanies this Memorandum Opinion.

Dated:  November 26, 2018

Amit P. Mehta
United States District Judge